2016 OK 71

Jackie WATKINS, as Guardian Ad Litem for Jane Doe, Plaintiff/Appellant,

v.

CENTRAL STATE GRIFFIN MEMORI-AL HOSPITAL; Oklahoma Department of Mental Health and Substance Abuse Services; and Dr. Asma Mudassir, in her official capacity as a resident physician and individually, Defendants/Appellees.

No. 113,427

Supreme Court of Oklahoma.

FILED JUNE 21, 2016

Ryan M. Oldfield, Oklahoma City, Oklahoma, for Appellants

Bartlett H. Ramsey, Oklahoma City, Oklahoma, for Appellants

Wilson D. McGarry, Office of the Attorney General, for Appellees

Richard Neal Mann, Office of the Attorney General, for Appellees

WATT, J.:

¶ 1 We granted certiorari in this matter to address two issues: (1) is the limitations period in the Governmental Tort Claims Act, 51 O.S. §§ 151–258, tolled when state employees allegedly withhold facts critical to the analysis of potential negligence claims; and (2) does the record contain disputed facts material to this analysis? We answer both questions in the affirmative. We hold that the resolution of these issues contains questions for the trier of fact, making summary adjudication improper.

## PROCEDURAL HISTORY

¶ 2 The trial court plaintiff, Jackie Watkins ("Watkins"), in her capacity as guardian of her adult daughter, Jane Doe, seeks damages against defendants, Central State Griffin Memorial Hospital ("Griffin"), Oklahoma Department of Mental Health and Substance Abuse Services ("ODMHSAS") and Dr. Asma Mudassir ("Mudassir") [1], in her official capacity as a resident physician and individually. Plaintiff alleges (1) negligence, (2) negligent hiring, retention, and supervision, (3) joint enterprise, (4) agency, (5) respondeat superior, and (6) fraud against Defendants.

¶ 3 Griffin and ODMHSAS are state institutions and claims against these defendants are subject to the Oklahoma Governmental Tort Claims Act ("GTCA"), 51 O.S. 2011, §§ 151–258. Griffin is a hospital dedicated to clients in need of inpatient psychiatric treatment. Mudassir was a resident physician at Griffin during the relevant time period.

¶ 4 Watkins filed her Petition, February 1, 2013, more than one year after Ms. Doe's

---

1. Watkins initially included as a defendant, Nicholas Schiavo, the male nurse who conducted the pelvic exam on Ms. Doe. Before filing the Third Amended Petition, Watkins filed a dismissal without prejudice as to Schiavo after he filed for relief in bankruptcy.

inpatient hospital admission to Griffin.[2] Defendants filed a Motion for Summary Judgment urging her claims were barred by the one year limitation set forth in the GTCA. Defendants urge Plaintiff's claims are matters which were known or reasonably should have been discovered at the time of Ms. Doe's hospital admission. The trial court granted judgment in favor of Defendants. The Court of Civil Appeals ("COCA") affirmed, finding the undisputed material facts establish that Plaintiff knew, or in the exercise of reasonable diligence should have known, enough facts as of the time of the hospital admission to bring her claims.

¶ 5 Watkins alleges that misleading and/or deceptive actions by Griffin employees prevented her from discovering information essential to her claims. She further reasons the one year limitation period set out in the GTCA should not begin to run until such time as a diligent person could be reasonably expected to have discovered the relevant information. Watkins also asserts that the doctrine of estoppel should apply to prevent the Defendants from raising the time limitations bar of the GTCA as a defense to her claims. Under these circumstances, Watkins urges she could not have learned information crucial to her claim until she was appointed guardian of Ms. Doe.

¶ 6 The record contains evidence of two different levels of potential deception by Defendants. There is evidence that Griffin employees provided false information to civil and criminal investigators and that they may have acted in concert with regard to the deception. There is also evidence that Griffin then subsequently misled Watkins and Ms. Doe regarding the investigation results. In addition, pivotal conclusions reached by criminal investigators were derived from false information provided by Defendants. In light of this alleged deception, it is a question for the trier of fact to determine whether Watkins or Ms. Doe acted reasonably in not pursuing a civil action under the GTCA within one year of the hospital admission. We have long recognized that the determination of when a plaintiff possesses sufficient information to initiate the running of the statute of limitations is a question of fact. *Wing v. Lorton,* 2011 OK 42, ¶ 18, 261 P.3d 1122, 1127.

FACTUAL BACKGROUND

¶ 7 Ms. Doe was admitted to Griffin at 4:00 a.m. on March 19, 2011, for treatment of suicidal thoughts. At the time of admission, she was nineteen years old, five months pregnant and lived at home with her mother, Watkins. Later that day, Ms. Doe told Nicholas Schiavo, R.N., ("Schiavo"), she was having abdominal pain and was concerned she was having contractions. Schiavo took Ms. Doe into an exam room with no other witness present to check her for bleeding. He remained present in the room and watched while Ms. Doe removed her clothing from the waist down. Schiavo did not provide Ms. Doe with a sheet, drape or a gown. He then put on a glove, and conducted a pelvic exam while she was undressed on the exam table. No female staff was present. They were alone in the exam room for nine minutes. Some time later, Schiavo asked Ms. Doe if she was still involved in a relationship with the father or interested in dating other people. He also offered to perform another pelvic exam when she felt better.

¶ 8 Ms. Doe filed a complaint with Griffin prior to her March 21, 2011, discharge, claiming she felt violated by Schiavo conducting a "pelvic exam with no doctor or female present then joked and asked if [Ms. Doe] wasn't with the father was [she] looking to see other people and touched [her] shoulder".[3] Ms. Doe

---

2. For the relevant time period relating to Plaintiff's claims, Ms. Doe was admitted to Griffin on March 19, 2011 and discharged March 21, 2011.

3. See, Plaintiffs' Response to Defendants' Motion for Summary Judgment and Brief in Support, Plaintiff's Exhibit 3, "Griffin Memorial Hospital Complaint/Grievance Form, wherein Ms. Doe states, "Saturday, I (sic.) had contractions, I'm five months pregnant a staff nick Did a pelvic exam with no doctor or female present then joked and asked if I (sic.) wanted him to check me again After I felt better and was asking me if I wasn't with the father was I (sic.) looking to see other people and touched my shoulder I felt very violated. And talked to the female Doctor which she said it was wrong of him to make jokes and it was unprofessional but Did nothing I feel like he had no right or was qualified to Do so I feel action needs to be taken Due to this prior event

expressed she felt very violated by these actions. It is undisputed that Watkins knew about the specific concerns raised in the complaint submitted to Griffin. Watkins followed up with Griffin about the status of this complaint. She was told a formal investigation of the incident was being conducted.

¶ 9 An investigation by the Office of Inspector General ("OIG") of ODMHSAS, included reviewing the medical chart, relevant Griffin policies and procedures, and interviews of Schiavo, Mudassir and nurse managers. The medical chart does not contain a written order for a pelvic exam. Schiavo told the OIG investigator that he *did not* have a physician order for a pelvic exam and he contacted Mudassir *after* he did his assessment. A nurse coordinator employed with ODMHSAS for twenty years said that Griffin nurses do not conduct pelvic exams. Pregnant consumers needing this level of care are transported to a medical hospital for such an exam.[4] Mudassir told the OIG investigator that *prior* to the exam, Schiavo contacted her by telephone to inform her that Ms. Doe was having pains and possible contractions. Mudassir says she gave Schiavo a *verbal* order to conduct a pelvic exam. Mudassir says she did not document her order on Ms. Doe's chart because she was too busy. The investigator probed Mudassir and "[w]hen confronted with information that Mr. Schiavo told the investigator that he did *not* obtain a verbal order prior to the exam, Dr. Mudassir responded that he did contact her prior and obtained a verbal order."[5]

¶ 10 OIG concluded that: (1) the evidence collected "**supports** the allegation that RN Nicholas Schiavo violated Oklahoma Administrative Code (OAC) 450:15–3–8 (Right to

Freedom from Abuse, Neglect, or Mistreatment) by conducting a pelvic exam on consumer [Ms. Doe]";[6] and (2) Schiavo placed Ms. Doe in an unreasonable risk of harm by conducting a vaginal exam in private, having no witnesses and asking questions that made her feel uncomfortable. Following the OIG investigation, Schiavo was terminated from Griffin.

¶ 11 Griffin representatives told Watkins and Ms. Doe that Schiavo performed the pelvic exam *pursuant to physician orders* and there was no wrongdoing by Schiavo.[7] Griffin did not provide a copy of the report to Watkins or Ms. Doe. Griffin did not tell Watkins that Schiavo's actions violated Griffin policies or that his actions resulted in termination of his employment. Watkins *first* learned about the lack of a written physician order, lack of physician notes and Schiavo's termination *after* being appointed as guardian of Ms. Doe.

¶ 12 During Schiavo's employment at Griffin, his nursing practice was restricted by the Oklahoma Board of Nursing ("OBN") by the terms of a "Supervised Practice Agreement" required by his participation in the OBN Peer Assistance Program.[8] Under this agreement, it was *mandatory* for him to be supervised by another registered nurse working on the same unit for his entire shift.[9] Griffin was aware of Schiavo's participation in the Peer program and the associated restrictions and requirements of this supervision agreement.

¶ 13 On March 30, 2011, the Griffin Director of Nursing contacted the Peer program to report that Schiavo was terminated from Griffin for "doing things with out(sic.)

so no woman should endure this type of Abuse this shouldn't go unoticed (sic.) at p. 411–413.

4. See, Record, Tab 13, Plaintiffs' Response to Defendants' Motion for Summary Judgment and Brief in Support, Exhibit 3, ODMHSAS investigation file, Investigator Michael DeLong report.

5. See note 4, *supra*.

6. See, note 4, *supra*.,

7. See, note 4, *supra*., Exhibit 6.

8. 59 O.S. 2011, § 567.17.

9. See, Record Tab 20, Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment, Exhibit 4, "Supervised Practice Agreement: Nicholas C. Schiavo, RN, which provides in pertinent part:

4. Both the program participant and the supervising nurse are employed at the same facility working the same schedule during the assigned shift and are on the same unit/floor during the entire shift. At least one (1) of the supervising nurses must be present when the program participant is working.

Dr. Orders; 'pelvic exams'".[10] On April 26, 2011, the Peer Assistance Committee met and found that Schiavo was non-compliant and in default with his Peer contract as follows:

Item #8: Failure to follow the Supervised Practice Guidelines, *working without a Supervisor* present prior to approval by the Committee.

Item #9: Participant failed to follow the Policy and Procedure of the employing institution, Griffin Memorial Hospital and subsequently was terminated. (Emphasis added).[11]

Schiavo was terminated from the Peer program as a direct result of this default. The OBN then revoked Schiavo's registered nursing license because of his involuntary termination from the Peer program.[12]

¶ 14 Doe also filed a criminal report against Schiavo with the Cleveland county Sheriff's office. This investigation took place *after* the OIG interviews. This time, *both* Schiavo and Mudassir told the criminal investigator that Schiavo performed the pelvic exam at the direction and order of Mudassir. Although there is no written physician order in the medical chart or physician note, the criminal investigator relied on information from interviews that Mudassir gave a *verbal* order to Schiavo for the exam. The district attorney concluded if Schiavo acted *under the direction of a licensed physician*, the pelvic exam would be appropriate. Accordingly, there would be insufficient evidence of a crime. The Cleveland County district attorney's office declined to prosecute and cleared the case by exception.[13] The investigation results and decision of the district attorney was communicated to Watkins. She was again told that Schiavo performed the pelvic exam of Ms. Doe at the direction of the physician.

¶ 15 Ms. Doe's mental health condition remained unstable following her discharge from Griffin on March 21, 2011. During the fourteen months that followed, she spent approximately 107 days at mental health facilities for inpatient psychiatric treatment. At least 75% of these admissions were for *court-ordered* psychiatric treatment. In addition to chronic mental health issues, Ms. Doe has a cognitive disability. The record reflects that in elementary school her IQ was determined to be 68.

¶ 16 On May 10, 2012, Watkins was appointed guardian of her daughter. Shortly thereafter, she obtained medical records from Griffin that included the March 19, 2011, admission and a subsequent admission. Following her review, she discovered the medical chart *did not* contain a physician order or physician note relating to the vaginal exam by Schiavo. Watkins also found a reference in a discharge summary from a subsequent hospital stay suggesting there was more to the OIG investigation of Schiavo than she had been told. In addition, there is a note acknowledging that "[Ms. Doe] on a prior admission had been victimized by a staff member who was subsequently terminated because of that incident. The nature of the incident was sexual and [Ms. Doe] re-

---

10. See, note 4, *supra.*, Exhibit 14, Peer Assistance Program, OBN, Log of Transactions for Nicholas Charles Schiavo.

11. See, note 4, *supra.*, Exhibit 15, Before the Peer Assistance Committee, Termination/Finding of Default.

12. See, Record, Tab 20, Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment, Exhibit 6, OBN Licensure History Report.

13. See, note 4, *supra.*, Exhibit 7, Cleveland County Sheriff's Office Criminal Investigation Division; "[Det. Sgt. Scott A. Singer] spoke with the nursing supervisor and Mr. Mays. Both assured me that by policy, only under the advice of a physician, are such examinations made. Normally, the protocol allows for the patient to be trans-

ported to Norman Regional Hospital Emergency Department and the examination done there. A caveat to the above policy is if a physician directs a registered nurse to perform an initial examination to determine if transport is necessary can one be performed at Griffin Hospital. As [Det. Sgt. Singer's] investigation continued, Mr. Schiavo contacted me and agreed to speak with me about the incident. He told me that [Ms. Doe] was on his ward...... [Schiavo] told [Det. Sgt. Singer] that when she complained of contractions, he contacted Dr. Asma Mudassir. Dr. Mudassir according to Schiavo and Randy Mays told Schiavo to conduct the examination and to report his findings as soon as possible. While not noted on the nursing notes, Dr. Mudassir confirmed this accounting."

ported that simply being here was difficult."[14] Watkins learned *for the first time* in July, 2012, that: (1) Schiavo was terminated from Griffin in connection with this incident; (2) there was no physician order or note for the pelvic exam; and (3) Griffin viewed Ms. Doe as having been *victimized* by Schiavo's actions.

¶ 17 After learning these additional facts, on August 6, 2012, Watkins submitted a notice under the GTCA for "sexual *assault*"[15] of Ms. Doe for the pelvic exam done during the Griffin inpatient admission. This notice was rejected as untimely stating it had been more than 12 months since the March 19, 2011, hospital admission. Watkins subsequently filed her Petition with the district court on February 1, 2013, which was almost two years after the incident and nine months after her appointment as guardian.

¶ 18 Discovery proceedings in this litigation revealed even more facts previously unknown to Watkins. These later discovered facts form the basis of some of Watkins additional claims. Deposition testimony from Schiavo suggests evidence of a potentially darker story of deceit and fraud. Schiavo invoked his Fifth Amendment right to remain silent and refused to answer a number of questions. This refusal alludes to the possibility of intentional deception by both himself and Mudassir. Schiavo invoked his right to remain silent when asked to admit to the following:

- He never called Mudassir prior to performing pelvic exam of Ms. Doe.
- He never received an order to perform the assessment on Ms. Doe.
- He performed unauthorized pelvic exams on at least two other females.
- He lied to the OIG investigator.
- He lied to the Cleveland County Sheriff's department.
- He lied to the OBN investigators.
- He lied to an investigator with the Attorney General's office.
- He conspired with Mudassir.
- He obstructed justice.
- He concealed facts.[16]

**14.** See, note 4, *supra.*, Exhibit 17, Discharge Summary, 10–14–2011

**15.** The formal complaint filed with Griffin during Ms. Doe's hospital stay was in the nature of sexual *harassment* not *assault*.

**16.** See, note 4, *supra.*, Exhibit 1, Deposition of Nicholas Charles Schiavo, Volume I, May 21, 2014. Relevant excerpts include:

Q. Okay. You would agree that before your assessment of [Ms. Doe], you never called Dr. Mudassir. Correct?

A. On advice of counsel, I respectfully invoke my Fifth Amendment right to remain silent.

Q. Okay. I think I had read in some prior statements that you had—that you had said, I didn't call Dr.—or Dr. Mudassir before the examination, but I called her afterwards.

A. On advice of counsel, I respectfully invoke my Fifth Amendment right to remain silent.

Q. Would you agree that Dr. Mudassir never asked nor ordered you to perform the assessment on [Ms. Doe]? Record, p. 349.

Q. Okay. And after the assessment was concluded, you didn't chart that assessment and that it took place or the findings of that assessment?

A. On advice of counsel, I respectfully invoke my Fifth Amendment right to remain silent.

Q. You would agree that you've performed similar assessments on at least two other women at Griffin Memorial?

A. On advice of counsel, I respectfully invoke my Fifth Amendment right to remain silent.

Q. Okay. Have you ever lied to police investigators?

A. On advice of counsel, I respectfully invoke my Fifth Amendment right to remain silent.

Q. Had—did you ever lie to Michael Long [the OIG investigator]?

A. On advice of counsel, I respectfully request to invoke my Fifth Amendment right to remain silent.

Q. Did you lie to any investigators for the nursing board?

A. On advice of counsel, I respectfully invoke my Fifth Amendment right to remain silent.

Q. Was there a time that you lied to the Cleveland County Sheriff's Department or their investigators?

MR. KERNAL: Same thing.

A. On advice of counsel, I respectfully invoke my Fifth Amendment right to remain silent.

BY MR. OLDFIELD:

Q. Was there ever a time that you ever lied to any law enforcement as it relates to this case:

MR. KERNAL: Same thing.

A. On advice of counsel, I respectfully invoke my Fifth Amendment right to remain silent.

BY MR. OLDFIELD:

Q. Have you ever lied to any investigator with the State or the Attorney General's Office?

MR. KERNAL: Same thing

A. On advice of counsel, I respectfully invoke my Fifth Amendment right to remain silent.

BY MR. OLDFIELD:

Q: Have you ever conspired with Dr. Mudassir as it relates to this case?

- Did [Schiavo] engage in the conspiracy or coverup to hide the facts of what really happened?[17]

## SUMMARY JUDGMENT STANDARD

¶ 19 An order granting summary judgment in favor of Defendants was filed on November 18, 2014. Plaintiff appealed and the Court of Civil Appeals affirmed, holding: (1) the discovery rule did not toll the limitations period under the GTCA because Watkins knew or in the exercise of reasonable diligence should have known sufficient facts as of March 19, 2011 to state a claim; and (2) the tolling provision of 12 O.S. 2011 § 96 does not act to toll the limitations period due to Ms. Doe's claimed legal disability. We hold that when Watkins knew or *reasonably should have known* sufficient facts to assert her claims involve disputed issues of material fact and are properly determined by the trier of fact. Accordingly, we need not address the issue of the tolling provision for a legal disability under 12 O.S. 2011 § 96.

■ ¶ 20 Summary judgments are not favored and should only be granted when it is clear there are no disputed material fact issues. *Fargo v. Hays–Kuehn*, 2015 OK 56, ¶ 12, 352 P.3d 1223, 1227. We have consistently held that summary judgment should be denied where there are controverted material facts. *Id.* The appellate standard of review of a summary judgment is *de novo*. *Wing v. Lorton*, 2011 OK 42, ¶ 9, 261 P.3d 1122, 1125.

## ANALYSIS

■ ¶ 21 The Oklahoma Governmental Tort Claims Act ("GTCA"), provides the exclusive remedy for an injured plaintiff to recover against a governmental entity in tort. *Smith v. City of Stillwater*, 2014 OK 42, 328 P.3d 1192. The GTCA narrowly structures the method and time frame for bringing a tort claim against the State. 51 O.S. 2011 § 156. The claimant is generally required to give notice and file a formal action within the prescribed statutory time period. *Jarvis v. City of Stillwater*, 1987 OK 5, ¶ 5, 732 P.2d 470, 473.

■ ¶ 22 The notice provision of the GTCA furthers the following legitimate state interests: (1) prompt investigation with fresh evidence; (2) opportunity to correct dangerous conditions; (3) quick and amicable resolution of claims; and (4) allows fiscal planning to meet possible liability. *Reirdon v. Wilburton Bd. Of Ed.*, 1980 OK 67 ¶ 4, 611 P.2d 239, 240. Although Ms. Doe's initial written complaint to Griffin was not an official GTCA notice, it furthered at least two of the identified state interests. The state was afforded a *prompt* investigation resulting in swift termination of Schiavo's employment as well as definitive action with the OBN. Griffin had the opportunity to acquire relevant information and implement corrective action. We find there is no legitimate state interest in protecting state action that results in misleading Ms. Doe or Watkins.

■ ¶ 23 In *Jarvis*, the plaintiff, appealing from summary adjudication, sought application of the doctrine of estoppel to prevent the

MR. KERNAL: Same answer.

A. On advice of counsel, I respectfully invoke my Fifth Amendment right to remain silent.

BY MR. OLDFIELD:

Q. Have you ever obstructed justice in this case?

MR. KERNAL. Same answer.

A. On advice of counsel, I respectfully invoke my Fifth Amendment right to remain silent. Record 356–358

Record, pp. 356–358.

BY MR. OLDFIELD:

Q. Did you cover up or conceal any facts to any law enforcement regarding this case and the circumstances surrounding [Ms. Doe's] assessment and the orders that were given to you?

MR. MCGARRY: Objection.

A. On advice of counsel, I respectfully invoke my Fifth Amendment right to remain silent.

BY MR. OLDFIELD:

Q. Did you engage in a coverup or concealment of any facts as it relates to this case?

A. On advice of counsel, I respectfully revoke my Fifth Amendment—I respectfully invoke my Fifth Amendment right to remain silent. Record, pp. 363–364.

17. See, Record, Tab 15, Plaintiff's Motion for Partial Summary Judgment Against Defendants Central State Griffin Memorial Hospital and the Oklahoma Department of Mental Health and Substance Abuse Services and Brief in Support, Exhibit 1, Deposition of Nicholas Charles Schiavo, Volume 1.

government from asserting the defense of the time limitation bar under the GTCA. *Jarvis, supra,* 1987 OK 5, 732 P.2d 470. We identified the specific types of allegations that will estop a defendant from raising this defense.[18] Included·in this list are allegations of "false, fraudulent or misleading conduct or some affirmative act of concealment to exclude suspicion and preclude inquiry, which induces one to refrain from timely bringing an action".[19] We noted that a fact question is generally raised by such allegations. However, the plaintiff in *Jarvis* failed to establish the requisite elements. Thus, we left undecided whether this theory can be invoked against a defendant who seeks to enforce the time limitations set out in the GTCA.[20] We find that Watkins' allegations of false and misleading actions by the state falls into one of the categories for estoppel and raises questions of fact.

¶ 24 Estoppel has been applied against the state or its agencies where *"its interposition would further some principle of public policy or interest". Burdick v. Independent Sch. Dist.,* 1985 OK 49 ¶ 7, 702 P.2d 48, 53. (Emphasis added). The dispositive question raised by Watkins is whether under the facts presented, is there a prevailing public interest to create an exception from the strict limitation bar in the GTCA. Today we examine the application of estoppel under these facts and in light of allegations ·of potential fraud or concealment.

¶ 25 The record raises questions of fact regarding whether the state actively concealed or engaged in fraudulent or misleading conduct with respect to Ms. Doe's claims. Such factual issues are to be resolved by the trier of fact. Unlike the plaintiff in *Jarvis* who failed to establish any elements of estoppel, this record contains sufficient evidence suggesting misleading conduct or deception by the state. There is evidence

that Griffin *knew* that Schiavo had no physician order for the exam. The *Griffin* Director of Nursing notified the OBN of Schiavo's termination of employment as a *direct result* of performing pelvic exam *without* physician orders. Watkins testified by affidavit that Griffin communicated that Schiavo had done nothing improper and his acts were pursuant to physician order. Such a representation is directly at odds with the report made by the Griffin Director of Nursing·to the OBN.

¶ 26 There is also evidence to suggest that *both* Schiavo and Mudassir may have provided false information in the investigations conducted in the Griffin and criminal matters. Defendants argue that it was a representative from the *criminal* investigation and not a Griffin representative that led Watkins to believe there was a physician order for the pelvic exam. Defendants urge that it cannot be held as deceiving Watkins for information provided by the district attorney or sheriff's department. We find such an argument irrelevant. Any conclusion reached by the district attorney or the sheriff was a *direct result from potentially false and misleading information provided by Griffin employees, Mudassir and Schiavo.*

¶ 27 The record contains· sufficient evidence to raise a question as to whether Watkins and Ms. Doe were misled, deceived or were provided false information. It is for the trier of fact to determine if Defendants' conduct was misleading and whether such conduct induced Watkins to refrain from bringing a timely action.

¶ 28 Under these very narrow facts, estoppel may be applied to a time limitations defense under the GTCA. In this unique instance, estoppel furthers legitimate state purposes of not rewarding potentially wrongful government conduct and avoiding liability in tort. Ms. Doe, who was a teenager at the

---

18. "A fact question as to whether a defendant is estopped from interposing the defense of a time bar is generally raised by a plaintiff's allegations that the defendant had made (a) ·some assurance of settlement negotiations reasonably calculated to lull the plaintiff into a sense of security and delay action beyond the statutory period, or (b) an express and repeated admission of liability in conjunction with promises of payment, settlement or performance, or (c) any false, fraudulent or misleading conduct or some affirmative act of concealment to exclude suspicion and preclude inquiry, which induces one to refrain from timely bringing an action." *Jarvis* at ¶ 4.

19. See note 18, *supra.*

20. See note 18, *supra.*

time, was very fragile at the time of her Griffin admission. Griffin was to protect her and provide a safe environment. Instead, she was subjected to a pelvic exam that appears to have been done without a physician order and in violation of hospital policies. Next, the record suggests that she and Watkins were misled into believing that no wrongdoing occurred. This apparent deception is a second and separate potential harm from the initial unauthorized pelvic exam. The nurse's actions led to the termination of his employment with Griffin and the OBN revoked his nursing license. There is no legitimate state interest advanced by the state avoiding any potential liability in this matter through deceptive actions.

¶ 29 A statute of limitation is designed to run against those who "are neglectful of their rights, and who fail to use reasonable and proper diligence in the enforcement thereof." *Seitz v. Jones*, 1961 OK 283, ¶ 11, 370 P.2d 300, 302. The purpose of a limitations statute is to protect a defendant who might otherwise be compromised in defending a claim that has grown stale as a direct result of a person who has negligently failed to pursue their rights. *Id.* The record lacks evidence that Watkins or Ms. Doe acted negligently with respect to expressing concern about the incident with Griffin. To the contrary, Ms. Doe and Watkins notified Griffin of the concern surrounding the pelvic exam. Watkins then followed up with Griffin and was led to believe there was no reason for concern. Griffin had the benefit of a prompt and fresh investigation. There is no evidence that the timing of the filing of the Petition less than two years from the incident will compromise the government from defending a "stale" claim. In fact, Griffin had the benefit of an investigation and the assimilation of information within less than one month after the event.

¶ 30 We have also recognized the application of the discovery rule to toll the statute of limitations in general tort actions. *Woods v. Prestwick House, Inc.*, 2011 OK 9, 247 P.3d 1183. This rule allows the limitation period to be tolled until such time as the person knows or in the exercise of reasonable diligence, should have known sufficient infor-

mation to be aware of the claims. *Id.*, 2011 OK 9 at ¶ 24, 247 P.3d at 1189. Whether a plaintiff has used diligence in the pursuit of a claim or when a plaintiff as a reasonably prudent person knew or should have known of a claim is a question to be resolved by the trier of fact considering the unique facts and circumstances. *Wing v. Lorton, supra*, 2011 OK 42, at ¶ 18, 261 P.3d 1122, 1127.

¶ 31 We hold under this very narrow set of facts, the doctrine of estoppel may be applied to bar the Defendants from asserting the defense of the one year time limitation of the GTCA. For this doctrine to apply, the trier of fact must first determine if there is sufficient evidence of defendants' false, fraudulent, or misleading conduct, or an affirmative act of concealment to exclude suspicion and preclude inquiry, to induce Watkins from timely bringing an action. We find such a determination rests solely with the trier of fact. We further find that it is for the trier of fact to determine when Watkins knew, or in the exercise of reasonable diligence should have known, sufficient information to be aware of her claims. Accordingly, the opinion from the Court of Civil Appeals is vacated, the district court's grant of summary judgment is reversed, and this matter is remanded to the district court for proceedings consistent with this opinion.

**CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS' OPINION VACATED; DISTRICT COURT'S JUDGMENT REVERSED; AND MATTER REMANDED FOR FURTHER PROCEEDINGS**

REIF, C.J., COMBS, V.C.J., KAUGER, WATT, EDMONDSON, COLBERT, GURICH, JJ.—CONCUR

WINCHESTER, TAYLOR, JJ.—DISSENT